Louis J. Epps v. Commissioner.
Epps v. Commissioner
Docket No. 6778.
United States Tax Court
1946 Tax Ct. Memo LEXIS 173; 5 T.C.M. (CCH) 466; T.C.M. (RIA) 46134; May 31, 1946
*173 On the record, held, that petitioner has failed to sustain his burden of proving that he, as distinguished from his wife and daughter, was not the real partner of his son. Held, further, that petitioner is taxable on the income from the partnership in 1941 which was claimed by his wife and daughter. Edgar W. Pugh, Esq., 3353 Penobscot Bldg., Detroit 26, Mich., for the petitioner. Cecil H. Haas, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: Respondent determined a deficiency in petitioner's income tax liability for the year 1941 in the amount of $18,681.55. The question presented is whether petitioner rather than his wife and daughter is taxable as a partner on 60 per cent of a certain partnership's *174 income. Petitioner filed his income tax return with the collector of internal revenue for the district of Michigan at Detroit. The record consists of oral testimony and exhibits. Findings of Fact Petitioner is an individual residing at 746 Collingwood, Detroit, Michigan. At the time of the hearing, December 1945, he was 56 years old. From 1927 to 1931 petitioner was associated with Valley Steel Products Company, first as a salesman, later as vice-president. Valley Steel Products was a firm engaged in buying, selling and warehousing steel. In 1931 petitioner went to work for Consumers Steel Products Corporation, hereinafter referred to as Consumers, which had just recently been organized. Consumers was engaged in the business of buying, selling, warehousing and processing steel. Petitioner became president of Consumers in 1936, was a director and the largest individual stockholder of the company. In 1941 petitioner received a salary and bonus from Consumers in the amount of $25,000. Petitioner had been the dominant force in building up Consumers' business. Bernard S. Epps is petitioner's son. At the time of the hearing he was 34 years old. He left college after completing three *175 years and in 1932 went to work as a laborer for Consumers. In 1936 Bernard became purchasing agent for Consumers and in 1941 was receiving an annual salary of $10,000. During the early summer of 1941 the board of directors decided to liquidate Consumers' business. The liquidation was unsuccessfully contested by minority stockholders. After this decision to liquidate, Bernard began discussing with his mother and father the possibility of his, Bernard's, starting a new steel business. Bernard estimated that he would require about $15,000 capital. His mother and father were receptive to the scheme and willing to cooperate with Bernard in establishing the new business. On August 28, 1941, $15,000 was deposited in the Wabeek State Bank of Detroit to an account entitled "Bernard Epps & Company". [1] On the same date a check in the amount of $11,250 was drawn to the order of Bernard S. Epps on this account signed "Epps & Company, L. J. Epps", in the handwriting of petitioner. This check was endorsed by Bernard and deposited to his personal account with Wabeek State Bank on August 29, 1941. *176 A partnership agreement was executed. This agreement recites that it was "made and entered into this - day of September, 1941, but as of the 28th day of August, 1941, * * *." In the bank space before "day of September" is a light pencil marking which looks like 2nd or 3rd. The agreement is signed by Bernard S. Epps, as party of the first part, Lillie J. Epps, party of the second part, and Bernard S. Epps, trustee for Marylin Nan Epps, as party of the third part. Marylin (sometimes referred to in the record as Marilyn) is petitioner's daughter and was 15 years old at the time of the hearing. The agreement recites that the parties thereto have agreed to associate themselves as general partners "for the purpose of buying, selling and dealing generally in steel and all other products of every kind, nature and description whatsoever, * * *". The partnership agreement explains the interest of the party of the third part as follows: WHEREAS, the interest of the party of the third part arises through a trust created by Louis J. Epps, as of August 28th, 1941, for the benefit of his daughter, Marylin Nan Epps, and by the express provisions of said trust, the party of the third part is *177 directed to enter this partnership and is vested with full, complete and absolute control of said interest and said trust has been made permanent and irrevocable, * * * The agreement further recites that: * * * the respective parties agree that each of the parties hereto have contributed toward the capital of the partnership the following sums: Party of the first part -
$3,750.00
Party of the second part -
$7,500.00
Party of the third part -
$3,750.00 making a total sum received by the partnership from the parties hereto of $15,000.00. The agreement further provided in part as follows: 1. That the partnership shall be carried on for the purpose above stated. 2. That the partnership business began as of the 28th day of August, 1941, and shall continue for a period of fifteen years, unless sooner terminated by agreement, of the parties or by operation of law. 3. That the partnership shall be conducted and carried on under the partnership firm, style and name of Bernard S. Epps and Company, and with its principal place of business, located in the City of Detroit, Wayne County, Michigan, and inception of the business shall commence at 6450 E. McNichols *178 Road, in said City of Detroit; that appropriate papers shall be prepared and filed with the proper authorities, constituting notice of the partnership to the use of such assumed name. 4. It is mutually understood and agreed that by reason of the fact that it is contemplated that the respective parties hereto will be able to furnish services disproportionately to the capital interest they have in the partnership, that notwithstanding the capital interest of the respective parties in and to said partnership as above indicated, the respective parties shall share profits on the following basis: Party of the first part -
40%
Party of the second part -
40%
Party of the third part -
20% It is further understood and agreed that upon the dissolution of the partnership, all liabilities to third parties shall be satisfied; all sums loaned by any of the parties to the partnership shall be repaid with interest at the rate agreed upon at the time of the loan, and the salary of the party of the first part herein provided shall be paid pro rata to the date of dissolution. Of all balances remaining, the party of the first part shall receive 25% and the party of the second part *179 and the party of the third part shall receive 37 1/2% of the first $15,000.00, while the balance of any sum or sums available in excess of $15,000.00 shall be distributed to the parties hereto in the following proportion: Party of the first part -
40%
Party of the second part -
40%
Party of the third part -
20%
5. It is further mutually understood and agreed that notwithstanding anything herein contained to the contrary, the party of the first part will during the life of this partnership agreement contribute 40% and the party of the second part 40% and the party of the third part 20%, toward any losses, whether on capital or otherwise, sustained by the partnership. 6. It is further mutually understood and agreed that the party of the first part shall devote his whole time and attention to the carrying on of the business of this partnership and carry on and manage the same for the common benefit of the partners, to the utmost of his skill and ability, and shall not during the continuance of this partnership, be concerned or engaged, directly or indirectly except with the consent of the parties of the second and third parts, in any other business, by reason *180 of the fact that it is not contemplated that the parties of the second and third parts shall actively engage in the conduct of the business, and by reason of the fact that the party of the first part shall devote his full time and attention thereto, it is mutually understood and agreed that while the party of the first part shall be so employed by the partnership, he shall receive a salary of $10,000 per year payable in equal monthly installments. It was also provided that in the event one of the partners died the surviving partners should have an option to purchase the deceased partner's interest at book value. On September 11, 1941, a "Certificate for General Partnership Carrying on Business Under an Assumed Name" was filed with the county clerk of Wayne County, Michigan. This certificate provided in part as follows: 1. The name and style under which such business owned is to be conducted or to be transacted is "Bernard S. Epps & Company." The true or real full name of the persons owning, conducting or transacting such business, with the home and post office address of each, are as follows: Name: Bernard S. Epps; Home Address: 610 Blaine Avenue, Detroit, Michigan; P. O. Address: *181 6450 E. McNichols Rd., Detroit, Michigan. Name: Lillie J. Epps; Home Address: 2727 Cortland Ave., Detroit. Michigan; P. O. Address: 6450 E. McNichols Rd., Detroit, Michigan. Also on September 10, 1941, Bernard and Lillie signed a signature card on the Wabeek State Bank which authorized either Bernard or Lillie to draw checks on the partnership account. On March 2, 1942, but effective as of August 28, 1941, a trust agreement was executed by petitioner as grantor and Bernard as trustee for the benefit of Marylin. This trust agreement provided in part as follows: WHEREAS, Louis J. Epps, the Grantor, has simultaneously herewith turned over to the Trustee the sum of $3,750.00 to be held by him irrevocably in trust for the use and purposes and subject to the powers and provisions hereinafter set forth. NOW, THEREFORE, (1) The Grantor directs that said funds be used to purchase an interest in a partnership known as Bernard Epps and Company, which partnership consists of Bernard S. Epps, Lillie J. Epps and Bernard S. Epps, as Trustee for Marylin Nan Epps. The trust is to continue in effect until Marylin attains 28 years of age or dies prior thereto. At termination, the trust corpus *182 is to be distributed to Marylin, if living, otherwise, to her heirs share and share alike. If no heirs survive Marylin then the corpus is distributable to the heirs of Lillie Epps, excluding Bernard. The trustee is given broad management powers and discretion to distribute or withhold trust income. The intention of the grantor is stated to be that income distributed be used for luxuries and not for support or maintenance. On March 12, 1942, petitioner filed a Federal gift tax return with respect to the creation of the trust for Marylin. On February 26, 1942, petitioner filed a Federal income tax return for Marylin as guardian, reporting $10,947.67 as her income from the partnership. On March 24, 1942, a "Notice of Discontinuance of Co-Partnership" signed by Lillie was filed with the county clerk. This notice stated that the business conducted under the name of Bernard S. Epps and Company had been discontinued. On the same date a new certificate of co-partnership was filed reciting that Bernard S. Epps, Lillie J. Epps and Bernard S. Epps as trustee for Marylin Nan Epps were carrying on a business as co-partners under the name of Bernard S. Epps and Company. This certificate was *183 dated March 24, 1942, "but as of August 25, 1941." Bernard S. Epps and Company, hereinafter referred to as the Company, commenced its business activity in September 1941. Its office was located at 6450 East McNichols Road in Detroit, which was Consumers' plant. The office is described as a "cubbyhole" and was rented by the Company from Consumers, the rent in 1941 amounting to a total of $140. In addition to Bernard, the Company had one other employee in 1941, one of Consumers' bookkeepers on a parttime basis. The Company's balance sheet as of December 31, 1941, shows fixed assets as consisting of office furniture and fixtures valued at $306.89 and an automobile valued at $535.86. About 90 per cent of the Company's business consisted of selling steel on a brokerage basis. Bernard, for the Company, having mill contacts made while employed by Consumers, arranged sales of steel between prospective buyers and sellers, receiving a brokerage commission therefor. About 10 per cent of the Company's business consisted of buying steel and reselling it at a profit. Some of the Company's customers had formerly been customers of Consumers. Marylin performed no services whatsoever for the Company. *184 Lillie Epps occasionally signed Company checks when Bernard was out of town but otherwise took no active part in the business and knew very little about its conduct or operations. Petitioner, during 1941, was in a position to have rendered considerable services to the Company. He was president of Consumers until December 1941, at which time a receiver was appointed for Consumers. The receiver appointed petitioner to carry on the liquidation. Petitioner, as president of Consumers and as the receiver's agent, was the only executive representing Consumers in the building in which the Company's office was located. By September 1941 Consumers had sold its inventory of steel and had discontinued its buying and selling activities. The Company started its business in that month. The Company rented warehouse storage space from Consumers. In this connection Consumers, through petitioner, rendered certain services to tenants and storage space lessees. These services, among other things, included making arrangements for getting steel into or out of storage from or to customers. Petitioner also paid certain expenses for the Company when Bernard was out of town. Petitioner was reimbursed by *185 the Company for such expenses, which included such items as travel and entertainment. Petitioner would get in touch with Bernard by telephone when any matters of importance arose. During 1941, petitioner loaned the Company $12,500. Petitioner borrowed this money from a bank and then loaned it to the Company because the Company at that time had no established loan credit of its own. This loan plus interest was repaid to petitioner by the Company in December 1941. By April, 1942, Consumers had discontinued all its activities and the plant and facilities were sold in May, 1942. In May or June, 1942 petitioner was employed on a part-time basis by the Company and paid as salary for the remaining part of 1942 the amount of $7,166.60. Also in April, 1942, petitioner organized as a sole proprietorship the International Merchandising Company with offices in the Fisher Building, Detroit. In 1942, 1943 and 1944, petitioner received in profits from this Company, the respective amounts of $9,973.52, $13,868.16 and $18,581.26. The balance sheet of Bernard Epps and Company as of December 31, 1941, showed the following: ASSETS
CURRENT ASSETS
Cash in Bank
$34,097.13
Accounts Receivable
27,129.36
Merchandise Inventory
8,429.10
Deosit with American Airlines
425.00
Miscellaneous Accounts Receivable
1,058.00
TOTAL CURRENT ASSETS
$71,138.59
INVESTMENTS
50 shares - Luckens Steel Co. Common Stock
$ 700.00
2,000 shares - Consumers Steel Products Corp. (at cost)
2,600.50
3,300.50
PREPAID EXPENSES
$ 22.00
FIXED ASSETS
Office Furniture and Fixtures
$ 306.89
Automobile
535.86
$ 842.75
Less: Reserve for Depreciation
34.22
808.53
TOTAL ASSETS
$75,269.62
LIABILITIES
CURRENT LIABILITIES
Accounts Payable
$ 3,997.03
Accrued Payroll Tax
4.95
Accrued Partner's Salary
1,529.31
TOTAL LIABILITIES
$ 5,531.29
*186 NET WORTH
Bernard S. Epps, original investment
$ 3,750.00
40% of Net Profit Calendar Year 1941
21,895.33
$25,645.33
Lillie J. Epps, original investment
7,500.00
40% of net profit calendar year 1941
21,895.33
29,395.33
Bernard S. Epps, Trustee for Marilyn Nan Epps, original invest-
ment
3,750.00
20% of net profit calendar year 1941
10,947.67
14,697.67
69,738.33
TOTAL LIABILITIES AND NET WORTH
$75,269.62
The balances of the capital accounts as shown on the Company's general ledger as of January 1st of the years indicated, are as follows: Marylin's
Year
Bernard
Lillie
Trust
1942
$25,645.33
$29,395.33
$14,697.67
1943
43,142.16
52,000.22
27,479.73
1944
39,776.42
55,440.47
30,736.66
1945
55,293.00
74,809.04
40,873.03
The capital account representing Marylin's trust constituted the only records kept with respect to such trust. Bernard, as trustee, kept no separate accounts. The Company's profits allocated and added to these capital accounts for the years indicated are as follows: Marylin's
Year
Bernard
Lillie
Trust
1942
$28,745.78
$28,745.78
$14,547.39
1943
15,245.11
15,245.10
7,716.55
1944
23,393.17
23,393.17
12,427.21
*187 The only withdrawals from these capital accounts from 1941 to 1944, inclusive, were to pay income taxes on the allocated profits. In October 1945 Lillie, in addition to other withdrawals, withdrew $5,000 which was used to pay a note of like amount to the order of petitioner, dated January 30, 1945, and signed by Lillie. The note bore no interest. This note was purportedly made out to petitioner by Lillie to secure the unpaid balance of $7,500 which constituted Lillie's capital contribution to the Company and which had been purportedly borrowed by her from petitioner in August 1941. On January 29, 1945, Lillie paid petitioner by cashier's check $2,500 which purportedly constituted a partial payment on this alleged debt. For the year 1941 the Company filed a partnership return reporting a net income of $58,071.69. On Schedule J of this return the partners' shares were reported as follows: Bernard S. Epps
$25,228.69
Lillie J. Epps
21,895.33
Marylin Nan Epps
10,947.67
Bernard filed an income tax return for 1941 reporting $25,228.69 as income from the Company in addition to $8,590 as salary. Lillie filed a return for 1941 reporting as her sole income $21,895.33 *188 received from the Company. As previously stated, petitioner, as guardian, filed in February 1942, a return for Marylin, reporting as her sole income $10,947.67 received from the Company. In July 1944, however, Bernard, as trustee, filed a fiduciary return on behalf of Marylin's trust estate for the year 1941. This fiduciary return was labeled "Amended" and the letter of transmittal explained that the fiduciary return was intended to amend the return originally filed by petitioner, as guardian. The fiduciary return filed by Bernard, as trustee, reported as the trust's sole income $10,947.67 received from the Company in 1941. Petitioner filed a Federal income tax return for 1941 reporting as income $25,000 received as compensation from Consumers. No other income was reported. Respondent, in the notice of deficiency dated November 15, 1944, determined that petitioner was taxable on $33,759.79 of the Company's income in addition to the income originally reported by petitioner. Respondent explained this determination as follows: It has been determined that $33,759.79 of the net income of the partnership known as Bernard Epps and Company, Detroit, Michigan, for the year 1941 is taxable *189 to you under the provisions of Section 22 (a) of the Internal Revenue Code. The amount held taxable to you has been computed as follows: Net income of partnership as cor-
rected
$59,599.67
Less: Compensation of Bernard S.
Epps
3,333.36
Balance
$56,266.31
Your share thereof (60% or $56,266.31)
$33,759.79
The amount held taxable to you represents the portions (as adjusted) of the partnership income reported on the separate 1941 returns of your wife, Mrs. Lillie J. Epps, and Louis J. Epps as Guardian of Marilyn Nan Epps. Opinion Respondent contends that petitioner, rather than petitioner's wife and daughter, is a partner and as such is taxable on 60 per cent of the partnership's income. Petitioner contends that the wife and daughter are bona fide partners under the partnership agreement and that they are taxable therefor on 40 and 20 per cent, respectively, of the partnership's income. We agree with respondent that petitioner is taxable on 60 per cent of the partnership's income. The circumstances leading up to and surrounding the creation of the partnership strongly suggest to us that the partnership was, as a practical matter, *190 essentially a continuation of Consumers' business. In our opinion, the partnership's immediate ability to earn income stemmed from the established good will and reputation of Consumers. The partnership's instantaneous and substantial financial success, we think, resulted in a large degree from the momentum and going concern value inherited, so to speak, from Consumers. That the partnership was a continuation of Consumers' business is suggested by petitioner's failure to satisfactorily explain the reason for Consumers' liquidation. It is suggested that Consumers was liquidated because it became impossible in 1941 to purchase adequate quantities of steel. If this were the real reason for discontinuing Consumers' activities, it would seem imprudent to have established a new business which likewise depended upon the availability of steel. It is stated that the partnership's business consisted primarily of buying and selling steel on a brokerage basis whereas Consumers' business consisted primarily of buying and selling steel on a jobbing basis. It seems apparent to us that both methods of selling steel depend equally upon the availability of steel. Thus, we are unable to accept a tight *191 steel situation as an explanation for the liquidation of Consumers. If the primary reason for the liquidation of Consumers and the establishment of the partnership was to switch from jobbing to brokerage activities, no particular business reason can be seen for changing the form of doing business from a corporation to a partnership. It is not apparent to us why it would not have been feasible, solely from a business point of view, for Consumers to have merely contracted its jobbing activities and expanded the brokerage phase of its activities. It is also significant that a group of minority stockholders resisted the liquidation of Consumers. Many of the partnership's customers had formerly been customers of Consumers. It was also not unlikely that the partnership arranged sales for concerns from which Consumers had formerly bought. The partnership commenced its brokerage activities at about the same time Consumers discontinued its buying and selling. The partnership commenced its activities sometime in September 1941 with capital amounting to $15,000. At the end of 1941 in a 4-months period of time, the net worth of the partnership was $69,738.33, representing more than four times *192 the original capital invested. The circumstances of the unexplained liquidation of Consumers, the similarity of the business carried on by Consumers and the partnership and the extraordinary and immediate financial success of the latter indicate to us that the partnership's earning capacity was directly or indirectly derived from Consumers, which in turn had been primarily built up and controlled by petitioner. Under the circumstances described above, it would have seemed particularly essential to the success of petitioner's case to show by clear and convincing evidence that petitioner had effectively eliminated himself from participation in and control of the partnership activities. However, the evidence bearing on petitioner's relationship to the partnership is vague and obscure. The burden is on petitioner to overcome respondent's determination that petitioner was a partner in the company. Petitioner has not sustained this burden. The petitioner, during 1941, was in a convenient position to have rendered services and assistance to the partnership. The partnership's "cubby-hole" office was in the same building in which Consumers' offices were located. Petitioner, as the receiver's *193 agent in liquidating Consumers, was the only responsible executive in that building. As the receiver's agent, petitioner rendered services to the tenants and customers of Consumers of which the partnership was one. Since Consumers' business activities were substantially curtailed at the time the partnership's business activities were commencing, it is not unlikely that petitioner had sufficient time to devote to the partnership interests. There is some positive evidence in the record indicating that petitioner did in fact furnish valuable services to the partnership. When Bernard was out of town petitioner paid certain partnership expenses as they arose and entertained partnership customers for which he was reimbursed. During 1941 petitioner also loaned $12,500 to the partnership which he had in turn borrowed from a bank. This loan was repaid by the partnership to petitioner before the end of 1941. This loan transaction further illustrates the value to the partnership of petitioner's established reputation and business standing. We found as a fact that petitioner drew a check for $11,250 on the partnership account on August 28, 1941, payable to Bernard. The check was signed by petitioner *194 and over his name was printed "Epps and Company". This would indicate that the partnership had an account with the bank on that date and that petitioner was recognized by the bank as authorized to draw on such account. Petitioner contends that this check was signed by his wife whose initials are the same as his, but a comparison of the petitioner's and his wife's signatures on other documents clearly establishes the fact that the signature on the check in question is petitioner's. In any event, the signature card in evidence signed by petitioner's wife and son authorizing them to draw on the partnership account was not executed until September 10, 1941. Furthermore, we can not ignore the fact that petitioner was allegedly employed by the partnership in 1942 on a salary basis. Under these circumstances it would seem that petitioner was in a suitable position to render services to the partnership in 1941 and it appears that he did actually render some services and exercised some control. On the record it is impossible for us to clearly determine the exact character or the precise extent of these services and controls. The facts and circumstances which do appear from the record suggest *195 that petitioner could have and did participate in the partnership's activities to considerable degree. Petitioner has not successfully shown that he, in fact, eliminated himself from such activities. Petitioner has not only failed to convince us that the partnership's earning capacity was not to a large extent dependent upon petitioner but he has also failed to establish to our satisfaction that his wife and daughter were, in fact, bona fide partners. We are impressed with the unreality of their position as partners. In the first place, the record is in considerable confusion with respect to the legal formalities and financial arrangements relied on by petitioner as constituting his wife and daughter partners. The date of the partnership agreement is not definitely established. Bernard testified that his mother and father signed the partnership agreement. Petitioner's wife testified that she could not intelligently answer questions with respect to the circumstances under which the partnership agreement was executed. The testimony relating to the alleged loan from petitioner to his wife is confusing and contradictory. The check for $11,250 dated August 28, 1941, which we found as *196 a fact was signed by petitioner to Bernard's order, was identified by petitioner's wife as a check petitioner had given to her. Petitioner's wife also testified that she executed a note at that time to the order of her husband to evidence her indebtedness to him for the alleged loan of $7,500. This note is not in evidence and is alleged to have been lost. Actual repayment of this alleged loan did not occur until 1945. The trust established for the benefit of Marylin was not executed until March 1942. This confusion and contradiction relating to the formal papers and arrangements purporting to make petitioner's wife and daughter partners does not, in our opinion, lend particular credibility or substance to petitioner's contention. It is admitted that the wife and daughter performed no services to the partnership of any substantial character. It is also apparent that the capital furnished the partnership, except for Bernard's contribution, originated with petitioner. It is equally apparent, we think, that the partnership earnings were created by personal activity and intangible assets, such as good will, contacts and reputation, rather than by mere capital. See Earp v. Jones, 131 Fed. (2d) 292; *197 Schroder v. Commissioner, 134 Fed. (2d) 346; Mead v. Commissioner, 131 Fed. (2d) 323; Francis Doll, 2 T.C. 276, aff'd 149 Fed. (2d) 239, cert. denied 326 U.S. 725 (Oct. 8, 1945); Frank J. Lorenz, 3 T.C. 746, aff'd 148 Fed. (2d) 527; cert. denied, 327 U.S. 786 (March 5, 1946); M. M. Argo, 3 T.C. 1120, aff'd 150 Fed. (2d) 67, cert. denied, 326 U.S. 762 (Nov. 5, 1945). In this connection it is significant that in four months with an original capital of $15,000 the net worth of the partnership was increased to $69,738.33. The fixed assets of the partnership were negligible, amounting to only $808.53 as of December 31, 1941. It is also significant that the partnership borrowed $12,500 from petitioner which is only slightly less than the original capital and it repaid this amount within the first four months of its existence. This suggests to us that except for the purposes of reallocating income within the family group the original capital of $15,000 could have been borrowed and repaid which would have involved only a short-term interest expense. *198 We can see no business purpose for the inclusion of petitioner's wife and daughter as partners. They were not essential for purposes of raising capital nor did they perform any services. Neither the wife nor the daughter made any withdrawals from their capital accounts except for purposes of paying income taxes during the taxable year. See Frank J. Lorenz, supra, and Leonard W. Greenberg, 5 T.C. 732. The confusion of the record, the failure of the wife and daughter to perform services and their surplusage as a source of capital, in addition to the absence of any apparent business purpose to explain their inclusion as partners, and the fact that the partnership earnings depended upon services rather than capital all combine to impress us with the unreality of the status of the wife and daughter as partners. To sustain petitioner on the record before us would involve two factors. First, we would be required to give substantial recognition for tax purposes to a formal partnership and trust agreement and other financial formalities, the details of which are confused, contradictory and obscure. Secondly, we would be required to accept petitioner's conclusion, *199 in the absence of any substantial factual support or evidentiary proof, that he in fact had nothing to do with the partnership's operations. In other words, we would have to conclude that petitioner did not contribute capital or services to the partnership and that petitioner's wife and daughter did so, under circumstances sufficient to constitute them, and not petitioner, partners. Such a conclusion, in our opinion, is unwarranted, and in fact contrary to the gist of the confused and incomplete evidence before us. We recognize that factually the instant case presents a slightly new variation of the usual family partnership pattern. Under the usual pattern, the husband-taxpayer is formally a member of the partnership agreement and the only question is whether other members of the family have been successfully included. In the instant case the husband-taxpayer is not formally a party to the partnership agreement. Despite this variation we think the fundamental considerations are the same. Where the taxpayer is not formally a party to the partnership agreement, his participation and control may be less readily apparent. This factor does not relieve the taxpayer, however, of his usual *200 burden of proof. The taxpayer can not, by merely eliminating himself from the partnership agreement, shift the burden of proving his relationship to the partnership to respondent. Taxpayer can not point to the legal documents, remain mute and prevail. In our opinion this case is governed by the basic principles enunciated by such cases as Lucas v. Earl, 281 U.S. 111; Burnet v. Leininger, 285 U.S. 136; Helvering v. Horst, 311 U.S. 112; Helvering v. Eubank, 311 U.S. 122, as applied to the family partnership situation by Commissioner v. Tower, 327 U.S. 280 (Feb. 25, 1946). We have not been convinced that the partnership's income for 1941 was not to a large extent created by petitioner's contributions of services, skill, capital and other intangible assets. We are not convinced that petitioner, rather than his wife and daughter, was not the real partner of Bernard. Nor are we satisfied that the legal partnership formalities were more than an attempt to reallocate petitioner's income within the family group. We hold, therefore, that petitioner is taxable for 1941 on 60 per cent of the partnership income. Decision will *201 be entered for respondent. Footnotes
1. On the signature card the account's title has an initial scratched out between Bernard and Epps.↩